PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff and the Putative Class

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

MICHAEL VILLAGOMEZ, individually and on behalf of all others similarly situated,

Plaintiff,

v.

LOANDEPOT.COM, LLC, a Delaware limited liability company;

Defendant.

Case No.: '26CV6505 LL JAC

**CLASS ACTION COMPLAINT FOR:**

1. **Misleading Commercial Email Cal. Bus. & Prof. Code § 17529.5(a)(3**
2. **Aiding Interception of Communications Cal. Penal Code §§ 631(a), 637.2**

## I. INTRODUCTION

1. A sales pitch should not start with a lie about the recipient's money and end with false promises not to track the recipient. Here, Defendant sent Plaintiff Michael Villagomez a spam e-mail asking **"What will you do with your cash, MICHAEL?"**

2. Villagomez clicked and followed the spam email's link to loandepotamerica.com. He found no money waiting for him and so went to loandepot.com to investigate further. He was given the option to reject tracking, which he did. He then did a search asking "where is my money?" His refusal should have ensured there was no third party monitoring of his search. In reality, expert analysis shows that Defendant allowed a data broker called LeadiD to intercept Plaintiff's search in real time, link it to Plaintiff and use it to build an identity profile of Plaintiff.

3. The email claim challenges the false subject line in the e-mail. The privacy claim concerns loanDepot's false promise not to track plaintiff or share his searches with advertisers. Plaintiff seeks statutory damages and an injunction to stop Defendant from doing this to him and others.

## II. PARTIES AND EACH DEFENDANT'S ROLE

4. Plaintiff Michael Villagomez is a citizen of California residing in Vista, San Diego County. He owns and uses villagomezmichael32@icloud.com. He received the email at that personal address and engaged in the Website visit described below while physically present in California. That address is a California electronic mail address under Business and Professions Code section 17529.1.

5. Defendant LOANDEPOT.COM, LLC ("loanDepot") is a Delaware limited liability company with its principal place of business at 6561 Irvine Center Drive, Irvine, California 92618. Its public licensing disclosures identify that legal entity and NMLS identification number 174457. It owns, operates, or controls the lending business and Website at https://www.loandepot.com/ (the "Website").

6. LoanDepot also operates, authorizes, or commercially uses the landing page at loandepotamerica.com to obtain prospective borrowers. That page expressly identifies

loanDepot.com, LLC in its marketing-contact authorization, links its Terms of Use, Privacy Policy, and licensing disclosures to loandepot.com, and displays NMLS number 174457 and the same Irvine address. These details connect the advertised lending service to loanDepot.com, LLC; Plaintiff does not assume a separate company exists merely because a footer uses a domain name.

## III. <u>JURISDICTION AND VENUE</u>

7. This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. section 1332(d)(2), (5)(B), (6), and (10). The proposed nationwide CIPA Class exceeds 100 members, the aggregate amount in controversy exceeds $5 million exclusive of interest and costs, and minimal diversity exists. Plaintiff is a California citizen and the classes consist of citizens of all fifty U.S. states who received spam or were tracked while in California. For CAFA purposes, loanDepot is a citizen of Delaware, where organized, and California, where it has its principal place of business. Thus, there is substantial diversity.

8. The CIPA Class includes tens of thousands of persons. The estimate rests on loanDepot's nationwide lending business, the Website's role in attracting prospective borrowers across the United States, and the standardized deployment of the identified collection technology. At $5,000 per person under Penal Code section 637.2, a class of just 2,000 qualifying class members place $10 million in controversy without counting repeated events, email damages, or attorneys' fees. The estimate concerns the defined content-collection practice, not every person who merely loaded a page.

9. The CIPA Class is nationwide because the challenged aiding conduct is alleged to have been directed and implemented through loanDepot's California operations for its national Website. On information and belief, it includes citizens of numerous states, and California citizens do not constitute two-thirds of the class.

10. This Court has general personal jurisdiction over loanDepot because its principal place of business is in California. It also has specific jurisdiction over the challenged California lending, advertising, and Website conduct. loanDepot maintains its

business address here, solicits California borrowers, uses a California-directed loan-generation channel, and deploys the challenged tracking in the California transaction described in this Complaint.

11. Venue is proper in this District under 28 U.S.C. section 1391(b)(2) because a substantial part of the events leading to this claim occurred in this District; namely, Plaintiff received the spam e-mail and was tracked within this District.

## IV. THE EMAIL AND ITS MISLEADING CASH REPRESENTATION

12. The challenged email was dated November 4, 2026, at 6:15:12 p.m. Pacific Standard Time, addressed to villagomezmichael32@icloud.com, and displayed the sender "James | The Daily Note <james@digitalwealthsecrets.com>." Its Reply-To field used the same address. The exact subject was **"What will you do with your cash, MICHAEL?"**

13. Plaintiff had not requested this advertisement, applied for the advertised cash-out loan, received an approval for it, or been told that an identified amount was being held for him. He had no previous relationship with Defendant.

14. The words "your cash," paired with Plaintiff's first name and a question about what he would do with it, represented an existing personal availability of money. The body reinforced the offer. Plaintiff reasonably understood the message to mean cash was available to him and opened and followed it to investigate that representation; reasonable class members understood the same thing.

15. Plaintiff clicked the email's principal link, which used digitalwealthsecrets.com and an individualized encoded path. It took him to loandepotamerica.com. He searched the website but there was no money for him there. It simply pitched credit transactions.

16. The following visual reproduces the original message's displayed fields and body preserved in the supplied email.

**From:** James | The Daily Note <james@digitalwealthsecrets.com>
**Subject:** What will you do with your cash, MICHAEL?
**Date:** November 4, 2026 at 6:15:12 PM PST
**To:** villagomezmichael32@icloud.com
**Reply-To:** james@digitalwealthsecrets.com

**Your home's value increase = cash you can access today.**

Homeowners in your area are accessing thousands in cash from their homes.

Get My Cash Amount Now

If you would rather not hear from us again, let us know here.

11180 Hwy 51 S Ste 7 PMB 2005 Atoka, TN 38004

## V. PLAINTIFF'S VISIT AND THE TRACKING THAT CONTINUED

17. After receiving the e-mail, plaintiff clicked on the link and was taken to loandepotamerica.com. Finding no promised money, Plaintiff went to loandepot.com to investigate further. He rejected tracking through the Website's privacy controls and then searched for "where is my money." He was trying to determine what had become of the money the email led him to expect, not to invite unrelated companies to observe his financial inquiry.

18. Plaintiff intended only Defendant to receive his inquiry. He did not consent to a third-party listener, and his express rejection communicated the opposite. He did not knowingly authorize LeadiD, advertising companies, or data brokers to collect the substance of that interaction or tie it to persistent browser identifiers.

19. An expert analysis describes the technology operating during Plaintiff's visit. It separates a "Cookies Rejected" observation from a "Before Consent" observation. It shows that Defendant allowed a data broker to intercept his search and use it to build an advertising profile of Plaintiff. In technical terms, it identifies LeadiD, labeled in the

analysis as LeadiD/Verisk, sending requests to create.leadid.com and storing cookies for that separate domain.

20. The post-rejection network sequence includes requests named GenerateToken, SaveDom, InitFormData, Snap, and SaveDeviceId under create.leadid.com/2.20.2/. They are calls from the visitor's browser to the LeadiD recipient during the live Website interaction. The request sequence associates a campaign or publisher identifier with a visitor token and activity, rather than waiting for a later transfer of a completed loan file.

21. The displayed SaveDom request transmits browser-vendor and language information, platform and user-agent information, screen height and width, local-storage and session-storage capabilities, WebSocket availability, time-zone information, client time, and a visitor token. The browser also stores LeadiD-domain cookies named rgisanonymous, rguserid, and rguuid. These fields allow a recipient to recognize and link the browser to the monitored interaction. The allegation concerns the functions and data categories, not an assertion that illustrative token values in the analysis are Plaintiff's own permanent identifiers.

22. The analyzed financing interaction includes the page path /apply with product and cash-flow parameters, including prod=refinance and isgetcashflow=true. Those words identify the subject of the requested lending interaction, rather than merely the address of a server. They communicate that the browser is being used for a refinancing/cash-flow process. Plaintiff does not allege that he completed a loan application or supplied income, credit scores, or a Social Security number.

23. LeadiD obtained the financing-page context and the meaning of the loan-related interaction while its scripts processed the page and sent the documented activity and form-initialization calls. The bases for this inference are the contemporaneous GenerateToken, SaveDom, InitFormData, and Snap sequence, the analysis's finding that LeadiD tracked Website activity, the identified financing URL, and the platform's documented use of event-linked visitor identifiers.

24. The specific substantive communication alleged to have been learned by the third party is Plaintiff's interaction with the refinancing/cash-flow process, linked to the browser used for his inquiry about money. His exact search words identify what he personally did on the Website.

25. The analysis identifies Lead Intelligence, Inc., doing business under the Jornaya/LeadiD business, as the third-party platform recipient. Its published consumer policy describes a platform through which participating businesses verify data origin, analyze consumer interactions, and connect persistent browser identifiers to later events. The analysis's LeadiD/Verisk label identifies the technology observed; Plaintiff does not assume every corporate entity using a historical brand name received his communications.

26. On information and belief, the recipient used the event-linked record within that separate lead-intelligence platform to analyze and verify consumer interactions for participating businesses. The platform is alleged to provide independently useful event and identity information to a network of clients, rather than simply returning an anonymous counter to loanDepot.

27. The browser's transmissions occurred as the Website page and its scripts processed the live interaction. loanDepot caused that concurrent collection by placing or authorizing the recipient's code on the page. The theory is a third party learning a communication's meaning while it was being sent or received, not loanDepot later disclosing an already stored customer record.

## VI. <u>OTHER TRACKERS DOCUMENTED BEFORE CONSENT</u>

28. The analysis separately identifies Beeswax, Meta's Facebook Pixel, Google remarketing/DoubleClick, and Criteo before consent. These observations describe the Website's broader collection design and why a visitor's privacy choice matters. The post-rejection theory is based on the LeadiD sequence specifically identified above.

29. Beeswax requests reach segment.prod.bidr.io/associate-segment and include a customer key and segment key. Its advertising cookies include bito and bitoIsSecure. The requests associate a browser with an advertising audience segment. The report also

identifies device tracking and geolocation functions; Plaintiff does not allege that the demonstrated request reveals his street address or a precise GPS location.

30. Meta's request to facebook.com/tr includes an event marked PageView, the page address in the dl field, an _fbp-related browser identifier, event timing, and device dimensions. Google's DoubleClick request includes the page URL and the page title "Mortgage Lender - Home Loan Refinancing | loanDepot." Criteo's request includes a full-page-URL field, loanDepot's domain, an event identifier, and an _fbp-related identifier. These are concrete recipient and field descriptions, not a generic assertion that every cookie reads everything a visitor types.

31. A cookie is an identifier stored in a browser. The interception mechanism alleged here is the script-driven transmission of event information to another company while the person interacts with the Website. The cookie helps that company recognize which browser generated the event. This distinction matters: identifying a stored cookie, standing alone, would not establish that communication contents were intercepted.

## VII. LACK OF CONSENT, AIDING, AND THE PERSONAL INJURY

32. Plaintiff expressly rejected tracking before conducting his search for his money. He expected his interaction with the lender to remain between him and the lender rather than being simultaneously intercepted by a data broker, linked to him, and used to build a profile about him – but that is what happened.

33. LoanDepot chose the recipient's script, supplied or authorized the campaign configuration, allowed the browser calls to the separate recipient, and left that collection active after the privacy rejection. The observed campaign identifier, visitor-token sequence, and persistent activity despite the rejection support those allegations. loanDepot could disable or gate that code before it executes.

34. The underlying conduct is the recipient's willful, unconsented acquisition or attempted acquisition of the financing communication's contents or meaning during transit. loanDepot is liable under the fourth clause of Penal Code section 631(a) because it aids, agrees with, or employs that recipient to perform the described collection. Plaintiff

does not treat loanDepot's status as the intended recipient of his inquiry as permission to install another listener.

35. The privacy injury is the actual loss of control over an identifiable financial-browsing interaction after an express refusal, including the association of that interaction with a persistent browser record used for lead analysis. Plaintiff's inquiry concerned locating money he believed was available to him. The sensitivity lies in a privately directed financial interaction and its linkage to a recognizable visitor, rather than a bare interest in an ordinary retail product.

36. An unknown observer's examination and recording of a person's private dealings supplies the close historical relationship to intrusion upon seclusion. A reasonable person could find it highly offensive for a lender to invite a privacy choice, receive a rejection, and nevertheless allow a separate lead-intelligence platform to monitor the financing interaction. The claim does not depend on a future data breach, a speculative identity theft, or an unsupported assertion that a complete lifetime dossier was sold.

37. The email also caused a separate, personal interference. Plaintiff received the unsolicited message in his personal inbox, read the personalized cash representation, followed it to investigate, and spent attention and effort trying to locate the supposed funds. He then searched the lender's Website because the promised cash could not be found. His injury concerns the actual deceptive contact and resulting investigation, rather than statutory damages in the abstract.

38. The two injuries are traceable to the particular conduct alleged against the responsible Defendant. The Publisher and advertiser are responsible for the challenged campaign. loanDepot directly caused the Website collection through its own deployment and privacy-control choices, including after Plaintiff independently navigated from the landing page to loandepot.com. Monetary relief would redress the completed harms.

## VIII. CLASS ALLEGATIONS

39. Plaintiff seeks certification under Federal Rule of Civil Procedure 23(a) and (b)(3) of the following Email Class: All persons including citizens of all fifty U.S. states

who, within three years before filing this action through the certification date, received at a California electronic mail address an unsolicited commercial email promoting loanDepot's lending services through the digitalwealthsecrets.com campaign.

40. Plaintiff also seeks certification of the following CIPA Class: All natural persons in the United States whose communications on loandepot.com were acquired by the LeadiD platform through the collection configuration authorized and operated by loanDepot from California during the year before filing through the certification date, before the person affirmatively permitted that third-party collection.

41. Excluded are Defendants, their officers and employees participating in the challenged conduct, their controlled entities, the assigned judge and the judge's immediate family, and persons whose claims have been finally adjudicated or validly released. Membership turns on objective email, campaign, consent, page-event, and recipient records; it does not require a prior finding that a particular Defendant violated the law.

42. Numerosity is satisfied. On information and belief, the standardized email campaign reached hundreds or more California recipients, and the national Website's identified collection practice affected thousands of qualifying visitors. The nationwide lending service, standardized campaign link, repeatable script configuration, and event-linked record system support that estimate. Exact totals and recipient lists are in Defendants' and their vendors' records.

43. The Email Class presents common questions about what the fixed subject template represented, whether the advertised cash existed for recipients before any new loan, who procured or sent the campaign, knowledge of its misleading effect, and the applicable statutory incident limits. Those questions arise from a shared message and destination rather than unrelated advertisements with different promises.

44. The CIPA Class and subclasses present common questions about which communications the identified LeadiD configuration acquired, whether they revealed substantive financing information, when acquisition occurred, the recipient's independent role, loanDepot's assistance, the operation of prior-consent and rejection controls, and the

location of the challenged deployment conduct. Those questions can be answered through common code, configuration, network, and consent records.

45. Plaintiff's claims are typical because he received the defined email and experienced the identified Website collection practice, including after rejection. He will fairly and adequately represent the classes. He has no interest antagonistic to them and has retained counsel experienced in consumer class actions and privacy litigation.

46. Common questions predominate over individual ones. The challenged subject template and lender offer can be evaluated together; the CIPA theory is limited to the specified recipient, substantive event, and configuration. Differences in transmission dates, identifiers, and the amount of legally recoverable relief can be addressed through records, subclasses, or an appropriate damages process. The action does not assume that every tracker or every page operated in the same way.

47. A class action is superior because individual statutory claims are relatively modest compared with the cost of obtaining campaign, script, and recipient records. Common adjudication avoids repeated litigation of the same configurations and representations. Plaintiff seeks statutory monetary relief for completed events; he does not premise standing on a speculative future visit or seek an injunction on behalf of a class he cannot personally represent.

## IX. CAUSES OF ACTION

### COUNT ONE

### Misleading Commercial Email Subject Line

### California Business and Professions Code section 17529.5(a)(3)

48. The reproduced message was a commercial email advertisement promoting the lending service reached through its individualized link. It was unsolicited and sent to Plaintiff's California electronic mail address. The statutory claim is based solely on the materially misleading subject line under section 17529.5(a)(3).

49. The exact personalized subject represented cash presently available to the named recipient. No such pending, approved, or allocated cash existed for Plaintiff. The

underlying offer instead solicited a new application for secured borrowing. That difference was material to whether a reasonable recipient would open the message and investigate the purported funds.

50. Defendants knew the subject was likely to mislead for the reasons stated above, including their respective roles in selecting or authorizing a personalized cash-availability campaign for a new-loan offer. The deceptive representation induced Plaintiff's actual investigation. The claim concerns material falsity and deception within the exception in 15 U.S.C. section 7707(b)(1), rather than a technical email-labeling defect.

51. Plaintiff seeks $1,000 for each qualifying unsolicited advertisement under section 17529.5(b)(1)(B)(ii).

## COUNT TWO

### Aiding Unlawful Interception of Communications

### California Penal Code sections 631(a) and 637.2

52. The underlying communications included the refinancing/cash-flow page interaction and its substantive financing context identified above. LeadiD willfully obtained or attempted to learn that context during the live communication through the separately addressed script calls, without Plaintiff's consent. The acquired meaning was associated with a visitor token, device information, and browser cookies. Those identifiers explain whose interaction was recorded; they are not a substitute for the substantive financing communication.

53. loanDepot aided, agreed with, or employed the third-party platform by installing or authorizing its collection code, configuring the campaign connection, enabling browser transmissions during the interaction, and continuing the collection after Plaintiff rejected tracking. Its assistance caused the unconsented acquisition or attempted acquisition of the communication's meaning. No party's unilateral permission supplied the consent of all parties required by section 631(a).

54. Plaintiff suffered the concrete privacy injury described above as a result of the unauthorized collection. Penal Code section 637.2 authorizes recovery of $5,000 or three times actual damages, whichever is greater.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment as follows:

a. Certification of the appropriate classes under Rule 23(a) and (b)(3), appointment of Plaintiff as class representative, and appointment of Pacific Trial Attorneys as class counsel;
b. Statutory damages, interest, attorneys fees, and all other relief authorized by statute;
c. An injunction to prohibit such conduct in the future; and
d. Any and all other relief consistent with the pleaded claims.

Dated: November 16, 2026

PACIFIC TRIAL ATTORNEYS, APC

By:____________________________
Scott. J. Ferrell
Attorneys for Plaintiff and the Putative Class